# 25-0465-cv

## United States Court of Appeals

*for the*

## Second Circuit

—————◆—————

216 EAST 29TH STREET TRUST,

*Plaintiff-Appellant,*

– v. –

CITY OF NEW YORK,

*Defendant-Appellee,*

SAFE HORIZON, INC.,

*Intervenor-Defendant-Appellee,*

NEW YORK CITY COMMISSION ON HUMAN RIGHTS,

*Defendant.*

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

CURTIS A. JOHNSON
BOND, SCHOENECK & KING PLLC
*Attorneys for Plaintiff-Appellant*
350 Linden Oaks, 3rd Floor
Rochester, New York 14625
(585) 362-4701

CP COUNSEL PRESS    (800) 4-APPEAL • (514551)

## <u>DISCLOSURE STATEMENT</u>

Appellant 216 East 29th Street Trust (the "Trust") and its trustee, Marcus Sakow, and beneficiary, Shana Sakow, are not corporations.

i

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES.........................................................................iv

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................2

STATEMENT OF THE CASE....................................................................3

     I.     Local Law 10 (NYC Admin. Code §§ 8-102 and 8-107).....................4

     II.    Housing Choice Voucher Program (Section 8) .....................................6

     III.   Prosecution of the Trust, its Trustee and its Beneficiary....................13

     IV.   Procedural History................................................................................16

SUMMARY OF THE ARGUMENT .........................................................17

     I.     Local Law 10 Violates the Fourth Amendment ..................................17

     II.    Local Law 10 is Preempted by Federal Statute and Regulation .........19

     III.   The Trust's Claims are Not Subject to *Younger* Abstention................20

     IV.   The Trust's Claims are Ripe .................................................................21

     V.    The Trust has Standing ........................................................................22

ARGUMENT .............................................................................................23

     I.     Standard of Review .............................................................................23

     II.    The Trust's Challenge is Facial and Free from *Younger* Abstention...24

     III.   The Trust's Fourth Amendment Claim is Ripe ....................................28

IV.    The Trust has Standing to Pursue its Claim .........................................30

V.    Local Law 10 Violates the Fourth Amendment ...................................34

    A.    Existing Case Law Renders Local Law 10 Unconstitutional ...34

    B.    The Trust Has Protectable Fourth Amendment Interests ..........37

    C.    Searches, Even with a Special Needs Exception, Require Precompliance Review ...............................................................39

    D.    The City's Administrative Warrant Law Does Not Save it Here ..................................................................................................41

VI.    NYC Admin. Code § 8-107 is Preempted by Federal Law and Regulations ........................................................................................45

    A.    An Actual Conflict Exists, Making Compliance with NYC Admin. Code § 8-107 Impossible ..............................................45

    B.    NYC Admin. Code § 8-107 is an Obstacle Because it Undermines the Intended Effect of the Section 8 Statute and Regulations .................................................................................46

    C.    HUD's Position on Preemption in Inapposite ..........................52

CONCLUSION ........................................................................................53

21487884.v3

# TABLE OF AUTHORITIES

**Case**  **Page(s)**

*Abateco Servs., Inc.,*
   23 Va. App. 504 (Va. Ct. App. 1996) ............................................................36

*Anobile v. Pelligrino,*
   303 F.3d 107 (2d Cir. 2001) ..........................................................................37

*Atlantic Mortg. and Inv. Corp. v. Pervis,*
   21 Conn. L. Rptr. 619 (Conn. Sup. Ct. 1997) ...............................................49

*ATM One, LLC v. Incorporated Village of Hempstead,*
   91 A.D.3d 585 (2d Dep't 2012) .....................................................................35

*Austin Apt. Ass'n v. City of Austin,*
   89 F. Supp. 3d 886 (W.D. Tex. 2015) ...........................................................52

*Baker v. City of Portsmouth,*
   1:14cv512,
   2015 WL 5822659 (S.D. Ohio Oct. 1, 2015)..................................................34

*Barr v. Am. Ass'n of Political Consultants,*
   591 U.S. 610 (2020)..................................................................................21, 27

*Barrientos v. 1801-1825 Morton, LLC,*
   583 F.3d 1197 (9th Cir. 2009).........................................................................19

*Bigio v. Coca-Cola Co.,*
   675 F.3d 163 (2d Cir. 2012)............................................................................24

*Board of Educ. v. Allen,*
   392 U.S. 236 (1968).........................................................................................30

*Board of Educ. v. New York State Teachers Retirement Sys.,*
   60 F.3d 106 (2d Cir. 1995)........................................................................22, 30

*Brower v. Village of Bolingbrook,*
   735 F.Supp. 768 (N.D. Ill. 1990) ...................................................................40

iv

*Camara v. Municipal Court of City and County of San Francisco*,
    387 U.S. 523 (1967)...................................................... 17, 22, 28, 31, 34, 37

*Carter v. HealthPort Techs., LLC*,
    882 F.3d 47 (2d Cir. 2016)..............................................................23

*Cecos Int'l., Inc. v. Jorling*,
    706 F.Supp. 1006 (N.D.N.Y. 1989) ...............................................25

*City of Los Angeles v. Patel*,
    576 U.S. 409 (2015)................................................................*passim*

*City of New York v. FCC*,
    486 U.S. 57 (1988).........................................................................44

*Collins v. Virgina*,
    584 U.S. 586 (2018)......................................................................38

*Comm'n Human Rights ex rel. Watson v. PPC Residential*,
    OATH Index Nos. 2245/19, 2246/19, Memorandum Decision (Sept. 11,
    2023) ..............................................................................................29

*Conway v. Harris*,
    586 F.2d 1137 (7th Cir. 1978).......................................................49

*Crook v. City of Madison*,
    168 So.3d 930 (Miss. Sup. Ct. 2015) ............................................43

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000)................................................................45, 47

*Cullen v. Village of Pelham Manor*,
    No. 03-CV-2168,
    2009 WL 1507686 (S.D.N.Y. May 28, 2009)................................34

*Curto v. Medical World Communications*,
    No. 03-Civ. 6327 (DRH) (MLO),
    2006 WL 1318387 (E.D.N.Y. May 15, 2006) ...............................39

v

*Dearmore v. City of Garland*,
    400 F.Supp.2d 894 (N.D. Tex. 2005)..............................................................34

*Doe v. Putnam County*,
    344 F. Supp. 3d 518 (S.D.N.Y. 2018)......................................................22, 30

*Edwards v. Hopkins Plaza Ltd. Partnership*,
    738 N.W.2d 171 (Minn. Ct. App. 2010)........................................................49

*Evans v. Lucas Metropolitan Housing Auth.*,
    3:15 CV 389,
    2016 WL 7407539 (N.D. Ohio Dec. 22, 2016) ............................................36

*Field Day, LLC v. County of Suffolk*,
    463 F.3d 167 (2d Cir. 2006).....................................................................26, 27

*Flynn v. City of Lincoln Park*,
    2:15-cv-12187,
    2020 U.S. Dist. LEXIS 9433 (E.D. Mich. Jan. 21, 2020) ......................32, 33

*Geller v. Cuomo*,
    476 F. Supp. 3d 1 (S.D.N.Y. 2020) ..............................................................27

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)........................................................................................47

*Isham v. Pierce*,
    694 F.2d 1196 (9th Cir. 1982)......................................................................48

*Kosoglyadov* v. *3130 Brighton Seventh, LLC*,
    54 A.D.3d 822 (2d Dep't 2008) ....................................................................50

*Knapp v. Smiljanic*,
    847 F.Supp. 1428 (W.D. Wis. 1994).............................................................49

*Kunstler v. Central Intelligence Agency*,
    22-cv-6913 (JGK),
    2023 WL 8776339 (S.D.N.Y. Dec. 19, 2023)...............................................38

vi

*Lakewood v. Plain Dealer Pub. Co.*,
 486 U.S. 750 (1988)............................................................25

*Leventhal v. Knapek*,
 266 F.3d 64 (2d Cir. 2001)...............................................39

*Losquadro v. Incorporated Village of Sea Cliff*,
 36 Misc.3d 1214(A) (Sup. Ct. Nassau Cnty. 2012)...........35

*Love v. Port Authority of New York and New Jersey*,
 168 A.D.2d 222 (1st Dep't 1990) .....................................43

*Makula v. Village of Schiller Park, IL*,
 No. 95 C 2400,
 1995 WL 755305 and
 1998 WL 246043 (N.D. Ill. Dec. 14, 1995 and Apr. 30, 1998).....................34

*Metropolitan Omaha Property Owners Association, Inc. v. City of Omaha, Neb.*,
 8:19CV431,
 2019 WL 7049104 (D. Neb. Dec. 23, 2019) ...................42

*Meyers v. Health & Hosp. Corp.*,
 14-CV-7448 (CBA),
 2016 WL 2946172 (E.D.N.Y. May 18, 2016) .................24

*Mother Zion Tenant Ass'n v. Donovan*,
 55 A.D.3d 333 (1st Dep't 2008) ...............................49, 50

*New York v. Burger*,
 482 U.S. 691 (1987).........................................................40

*New York v. Harris*,
 495 U.S. 14 (1990)...........................................................18

*Paris v. Dep't of Hous. and Urban Dev.*,
 843 F.2d 561 (1st Cir. 1988) ...........................................19

*Paschow v. Babylon*,
 53 N.Y.2d 687 (1981) ......................................................20

21487884.v3

*People v. Commons West, LLC*,
    80 Misc.3d 447 (Sup. Ct. Tompkins Cnty. 2023) ....................................17, 35

*People v. Commons West, LLC*,
    224 N.Y.S.3d 364 (Sup. Ct. Tompkins Cnty. 2024) ...............................17, 35

*People v. Ivybrooke Equity Enterprise, LLC*,
    175 A.D.3d 1000 (4th Dep't 2019) .................................................................51

*People v. James H. Northrop, Inc.*,
    106 Misc.2d 440 (App. Term. 2d Dep't 1980) ...............................................35

*Planned Parenthood v. Casey*,
    505 U.S. 833 (1992).........................................................................................26

*Poulos v. Pfizer, Inc.*,
    244 Conn. 598 (Conn. 1998) ...................................................................20, 36

*Pure Power Boot Camp v. Warrior Fitness Boot Camp*,
    587 F.Supp.2d 548 (S.D.N.Y. 2008) ..............................................................39

*Riley v. California*,
    573 U.S. 373 (2014).........................................................................................38

*Rosario v. Diagonal Realty, LLC*,
    8 N.Y.3d 755 (2007) .......................................................................................50

*Salute v. Stratford Greens Garden Apartments*,
    136 F.3d 293 (2d Cir. 1998)...........................................................19, 47, 48

*Schneckloth v. Bustamonte*,
    412 U.S. 218 (1973)...................................................................................17, 18

*Sellers v. Contino*,
    327 F. Supp. 230 (E.D. Pa. 1971) ..................................................................36

*Skinner v. Railway Labor Executives' Ass'n*,
    489 U.S. 602 (1989)........................................................................................40

*Sokolov v. Village of Freeport*,
   52 N.Y.2d 341 (1981) .................................................................22, 28, 31, 35

*State v. Finnell*,
   685 N.E.2d 1267 (Ohio Ct. App. 1996).......................................................35

*Tapia v. Successful Mgmt. Corp.*
   79 A.D.3d 422 (1st Dep't 2010) ..................................................................51

*Thompson v. City of Oakwood, Ohio*,
   307 F.Supp.3d 761 (W.D. Ohio 2018) .........................................................34

*Town of Brookhaven v. Ronkoma Realty Corp.*,
   154 A.D2d 665 (2d Dep't 1989) ..................................................................35

*United States v. Lifshitz*,
   369 F.3d 173 (2d Cir. 2004).........................................................................38

*United States v. McKenzie*,
   14 F.4th 223 (2d Cir. 2021)..........................................................................38

*University Club v. City of New York*,
   842 F.2d 2d 37 (2d Cir. 1988)................................................................20, 24

*Velez v. Sanchez*,
   693 F.3d 308 (2d Cir. 2012)....................................................................23, 24

*Wilson v. City of Cincinnati*,
   346 N.E.2d 666 (Ohio 1976) .......................................................................34

*Wirth v. City of Rochester*,
   Case # 17-CV-6347-FPG;
   2020 U.S. Dist. LEXIS 180289 (W.D.N.Y. Sep. 30, 2020)....................32, 42

21487884.v3

## Statutes and Other Authority

9 N.Y.C.R.R. § 2522.5 ....................................................................50

24 C.F.R. Part 982 ..................................................................7, 39

24 C.F.R. § 982.1 ........................................................................7

24 C.F.R. § 982.4 ........................................................................7

24 C.F.R. § 982.53 ..........................................................11, 44, 52

24 C.F.R. § 982.158 ......................................................................7

24 C.F.R. § 982.161 ..............................................................12, 45

24 C.F.R. § 982.162 ..........................................................9, 36, 44

24 C.F.R. § 982.305 ..................................................................8, 36

24 C.F.R. § 982.306 ....................................................................11

24 C.F.R. § 982.310 ....................................................................11

24 C.F.R. § 982.352 ......................................................................8

24 C.F.R. § 982.353 ......................................................................7

24 C.F.R. § 982.401 ..................................................................8, 9

24 C.F.R. § 982.405 ......................................................................9

24 C.F.R. § 982.451 ....................................................................44

24 C.F.R. § 982.507 ......................................................................7

28 U.S.C. § 1331 ..........................................................................1

42 U.S.C. § 1437f..............................................................*passim*

42 U.S.C. § 1983 ............................................................................1

42 U.S.C. § 1988 ............................................................................2

C.P.L.R. Art. 78 ............................................................................24

Fed. R. Civ. P. 12 .........................................................................23

Fed. R. Civ. P. 56 .........................................................................23

H.R. Rep. 104-461 (Feb. 1, 1996)
    1996 WL 49946 .......................................................................48

NYC Admin. Code § 8-102 ...................................................*passim*

NYC Admin. Code § 8-107 ...................................................*passim*

NYC Admin. Code § 8-120 ...............................................6, 18

NYC Admin. Code § 8-122 ......................................................5

NYC Admin. Code § 8-124 ......................................................6

NYC Admin. Code § 8-126 ...........................................5, 18, 35

NYC Admin. Code § 8-129 ...........................................6, 18, 35

NYC Admin. Code § 11-243 ...................................................50

NYC Admin. Code § 27-2123 .................................................41

NYC Charter § 398 ...................................................42, 43

U.S. Const. Art. VI ....................................................................44

## <u>JURISDICTIONAL STATEMENT</u>

The United States District Court for the Southern District of New York has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it involves Constitutional challenges to New York City statutes (NYC Admin. Code §§ 8-102 and 8-107), including under 42 U.S.C. § 1983. The United States Court of Appeals for the Second Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because the appeal is from a final decision and order of the district court dismissing the case. The District Court's decision in this case was issued on January 28, 2025, and the Notice of Appeal was timely filed on February 26, 2025. (A-236 – A-269.)

## <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

1.   Should the Trust's claims have been dismissed pursuant to *Younger* abstention?

    a. Are the Trust's claims facial or as-applied challenges to the constitutionality of NYC Admin Code §§ 8-102 and 8-107?

2.   Should the Trust's claims be dismissed for lack of ripeness?

3.   Should the Trust's claims be dismissed for lack of standing?

4.   Is the Trust entitled to summary judgment on its claims?

    a. Does Local Law 10 (NYC Admin. Code §§ 8-102 and 8-107) violate the Fourth Amendment of the U.S. Constitution and analogous provisions of the New York State Constitution?

    b. Is Local Law 10 (NYC Admin. Code §§ 8-102 and 8-107) preempted by the statutes and regulations governing the Housing Choice Voucher Program (Section 8)?

5.   If the Trust is entitled to summary judgment, should its claim for attorneys' fees under 42 U.S.C. § 1988 be remanded for the introduction of evidence regarding fees?

21487884.v3

## STATEMENT OF THE CASE

Local Law 10, codified at NYC Admin. Code §§ 8-102 and 8-107, violates the Fourth Amendment because it compels landlords to participate in the voluntary federal Section 8[1] program, and participants in Section 8 must consent to searches of their premises and grant the government access to books and records. Landlords who do not wish to submit to searches are subject to civil penalties, contempt orders and criminal penalties for refusing to participate in Section 8, which refusal the City has defined as a form of source of income discrimination. The statute applies equally to all New York City landlords and is unconstitutional on its face.

The City of New York, while pursuing the laudable goal of providing housing opportunities for low-income individuals, enacted Local Law 10, which makes it unlawful discrimination for landlords to refuse to participate in the federal Housing Choice Voucher Program. Local Law 10 refers to the program by its more common name, Section 8, and gives the New York City Commission on Human Rights the ability to fine landlords for source of income discrimination and order landlords to accept tenants with Section 8 vouchers. Landlords who refuse can be convicted of a misdemeanor.

---

[1] The Housing Choice Voucher Program is commonly referred to as "Section 8", including by the City of New York in NYC Admin. Code § 8-102.

3

Participation in Section 8 requires landlords to open their apartment units and the entirety of their properties for pre-lease Housing Quality Standards ("HQS") inspection and further requires landlords to sign Housing Assistance Payments ("HAP") contracts specifically granting the local agencies and the federal government access to apartment buildings and the landlords' books and records. It is impossible to participate in Section 8 without consenting to searches.

The Trust, and its trustee and beneficiary, do not wish to consent to searches and are being prosecuted by the New York City Commission on Human Rights for refusing to participate in Section 8. The Trust does not seek review of the facts specific to its prosecution in federal court, rather it challenges the law under which the prosecution is founded as it applies to all landlords.

## I. Local Law 10 (NYC Admin. Code §§ 8-102 and 8-107).

In 2008, New York City adopted Local Law 10, which amended Title 8 of its administrative code regarding civil rights, making it unlawful for landlords to discriminate based on what it defined as lawful sources of income. (Local Law 10 available at: https://www.nyc.gov/assets/cchr/downloads/pdf/amendments/ammend2008.pdf.) The stated legislative intent of that law referenced Section 8 vouchers and noted that "[t]his bill would make it illegal to discriminate on that basis." (*Id*.) Specifically, the law amended § 8-102 of the NYC Admin. Code to add the term "lawful source of income" and define it to include "any form of federal,

state or local public assistance including section 8 vouchers." (*Id.*) It further amended § 8-107 to add to subsection (5)(c) language making it illegal discrimination "[t]o refuse to sell, rent or lease any housing accommodation . . . to any person or group of persons . . . because of any lawful source of income of such person or persons . . . or to represent that any housing accommodation . . . is not available for inspection, sale, rental or lease when it is in fact so available . . . because of any lawful source of income of such person or persons." (*Id.*) It went on to make it unlawful discrimination to "declare, print or circulate or cause to be declared, printed or circulated any statement, advertisement or publication . . . which expresses, directly or indirectly, any limitation, specification or discrimination as to . . . any lawful source of income." (*Id.*)

The penalties for declining to accept tenants who wish to participate in Section 8 by refusing to participate in the voluntary program include civil fines, injunction and criminal prosecution. The NYC Commission on Human Rights is vested with the power, even before adjudication of a complaint, to seek injunctive relief compelling compliance with the law. NYC Admin. Code § 8-122. After a hearing, the Commission can assess penalties against a non-compliant landlord of up to $125,000, and where the landlord's non-compliance is found to be willful those fines can increase to $250,000. *Id.* at § 8-126. In addition to assessing fines, the Commission has the power to compel the landlord to participate in Section 8, pay

5

compensatory damages, submit reports regarding the manner of compliance, and pay a complainant's attorneys' fees. *Id*. at § 8-120. If a landlord refuses to comply with an order requiring it to consent to searches by participating in Section 8, it can be subject to a further fine of up to $50,000 plus $100 per day and can be prosecuted criminally for commission of a misdemeanor, subjecting the landlord to up to a year in jail and additional $10,000 fine. *Id*. at §§ 8-124 and 8-129.

By compelling landlords to participate in Section 8, which requires landlords to consent to searches under penalty of fine, injunction and criminal prosecution, Local Law 10 of 2008 gives rise to a facial violation of the Fourth Amendment, as applied to the states under the Fourteenth Amendment.

## II.    Housing Choice Voucher Program (Section 8).

The Housing Choice Voucher Program, which is commonly referred to as Section 8, is on its face, a voluntary federal program that allows tenants to seek landlords willing to provide them housing, a portion of which will be paid for with public funds. Section 8 was enacted in 1974 through an amendment to the U.S. Housing Act of 1937. 42 U.S.C. § 1437f. It is governed by a complex set of federal regulations that determine landlord and tenant eligibility, limit the types of properties that can participate in the program, govern the role of the landlord, tenant and Public Housing Authority ("PHA"), require the landlord to enter into a separate contract with the PHA for each unit leased, set limits on the rent that landlords can charge,

6

provide for governmental inspection of properties and financial records and more. 24 C.F.R. Part 982.

"In the HUD Housing Choice Voucher (HCV) program HUD pays rental subsidies so eligible families can afford decent, safe, and sanitary housing." 24 C.F.R. § 982.1(a)(1). "Families select and rent units that meet program housing quality standards." *Id*. at § 982.1(a)(2). The PHA enters into a separate contract, the HAP contract, with the landlord to make payments on the family's behalf. *Id*.

Not every housing unit is eligible for participation in Section 8. Eligibility is based on meeting HQS and price requirements.[2] Before a PHA can approve a tenant

---

[2] The PHA will only permit a landlord and tenant to participate in Section 8 with respect to a specific apartment if it determines the rent being charged is reasonable. 24 C.F.R. §§ 982.1(a)(2), 982.353(e) and 982.507(a)(1). Reasonable rent "is not more than rent charged: (1) For comparable units in the private unassisted market and (2) For comparable unassisted units in the premises." *Id*. at § 982.4(b). Reasonable rent must be determined initially, before any increase in rent by the landlord, any time HUD directs and any other time of the PHA's choosing. *Id*. at § 982.507(a). The first component of reasonable rent requires the PHA to determine how much the market would charge for a particular unit. The second component requires the PHA to access the landlord's financial records to determine the prices being charged for comparable units at the same premises. *Id*. at §§ 982.507(b) and (d). Every time the landlord accepts a monthly housing assistance payment it must certify that the rent is comparable to the rent for unassisted units in the premises. *Id*. at § 982.507(d). The PHA must then maintain copies of landlords' records and make them available for audit. *Id*. at § 982.158(f)(7). Federal law requires that an assistance contract must establish the "maximum monthly rent (including utilities and all maintenance and management charges)." 42 U.S.C. § 1437f(c)(1)(A).

Even units that are determined to be priced fairly may not be eligible for Section 8 if they are too expensive for the prospective tenant. A family cannot receive rental assistance where the gross rent exceeds 40% of a family's monthly adjusted income.

7

and landlord for participation in Section 8, the PHA must inspect the unit to confirm that it satisfies HQS. 24 C.F.R. § 982.305(b). HQS standards include certain key aspects such as "(A) Sanitary facilities; (B) Food preparation and refuse disposal; (C) Space and security; (D) Thermal environment; (E) Illumination and electricity; (F) Structure and materials; (G) Interior air quality; (H) Water supply; (I) Lead-based paint; (J) Access; (K) Site and neighborhood; (L) Sanitary condition; and (M) Smoke detectors. *Id*. at § 982.401(a)(2)(ii). The sanitary facility requirement means each eligible unit must have an in-unit bathroom. *Id*. at § 982.401(b). Units must also have their own kitchens including an oven, stove/range and refrigerator of appropriate size for a family, kitchen sink, countertop space and garbage cans. *Id*. at § 982.401(c). Units must have a living room, kitchen area and bathroom in addition to at least one bedroom for each two persons. *Id*. at § 982.401(d)(2)(i) and (ii). They must also have windows that accesses the outdoors on either a ground floor or with a fire escape. *Id*. at § 982.401(d)(2)(iii). Certain types of housing are not eligible for Section 8, including public housing, project housing, nursing homes, college dormitories and owner-occupied units. *Id*. at § 982.352(a).

The PHA's HQS inspection looks for adequate heating, locks, lighting and electricity, structural soundness, working elevators, air ventilation, water supply,

---

24 C.F.R. § 982.305(a)(5). Moreover, an applicant cannot be receiving some other form of housing subsidy, including any local or state rental subsidy. *Id*. at § 982.352(c).

lead-based paint compliance, neighborhood quality, absence of rodents and insects and the presence of smoke detectors. 42 U.S.C. § 1437f(o)(8); 24 C.F.R. §§ 982.401 and 982.405. There is both an initial and periodic inspection. *Id.* at § 982.405(a). Landlords are required to permit government inspectors or their agents into buildings for these inspections, and the inspection is not limited to the unit being negotiated, but covers the building and premises the unit is in. (A-207 at ¶ 11.)

Landlords and PHAs are required to use the HUD-approved contracts, including the HAP contract between the PHA and property owner and a "tenancy addendum required by HUD (which is included in both the HAP contract and in the lease between the owner and the tenant)." 24 C.F.R. § 982.162. The HAP contract tracks the regulations and specifically provides that the landlord agrees that "[t]he PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS." (A-204 at ¶ 3(e).) It further mandates the landlord to consent to government review of books and records to determine reasonable rent, specifically stating that "[t]he owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere." (A-205 at ¶ 6(d).) It goes on to require the landlord's consent to entry and access to records by the PHA, HUD and the Comptroller General of the United States. (A-207 at ¶ 11.) The scope of that access is extremely broad, and the HAP contract language states:

9

**11. PHA and HUD Access to Premises and Owner's Records**

  a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

  b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

  c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

(*Id.*) Of note is the access that must be granted to the government to "any computers, equipment or facilities containing . . . records." (*Id.*) This provision does not prohibit the government from accessing other records on those computers or at those facilities, and the government can be expected to search the entirety of computers and facilities to confirm that it has reviewed all pertinent records. Because owners who commit fraud, bribery or any other criminal acts are in breach of the HAP contract (A-206 at ¶ 10(a)(3)), inspection of computers and devices would almost certainly be used to look for evidence of those crimes. In fact, ¶11(b) and (c), as co-equal subsections, are not limited by the reasonableness limitation in ¶11(a). (A-207.)

Owners cannot increase rents demanded of Section 8 tenants once their tenancy begins without obtaining the approval of the PHA. 42 U.S.C. §

10

1437f(o)(10)(B). If an owner seeks to increase rent to keep up with inflation or market trends, but the PHA does not approve of the increase, the PHA can deny payment to the owner, leaving the owner to deal with the tenant and a potential eviction. *Id*.

Owners must give up certain eviction rights and enforce certain eviction rules with which they might not agree. Landlords may only terminate leases with Section 8 tenants if they commit a serious violation of the terms and conditions of the lease (including the failure to pay rent), violate federal, state or local laws and for other good cause. 24 C.F.R. § 982.310(a). However, landlords may not terminate a tenancy if the PHA fails to pay rent. *Id*. at § 982.310(b). Tenants, or their guests, who engage in drug-related crimes on or near the premises, and tenants whose household members illegally use drugs that interfere with the health, safety and right to peaceful enjoyment of the premises by other tenants, are subject to lease termination. *Id*. at § 982.310(c)(1). Likewise, the owner is expected to evict tenants who engage in other criminal activity that threatens other tenants even if that criminal activity is not taking place on-site, regardless of whether that person has been arrested or convicted of a crime. *Id*. at § 982.310(c)(2).

The State cannot make acceptance of Section 8 mandatory for all property owners. For example, certain types of landlords are barred from participation in Section 8, including present and former members or officers of a PHA, employees

of a PHA or any contractor or subcontractor of a PHA responsible for policy formation or decision making, public officials, or members of state and local legislatures who exercise functions or responsibilities with respect to the programs and members of Congress. 24 C.F.R. § 982.161(a). Owners can be debarred, suspended or subject to a limited denial of participation. *Id*. at § 982.306(a). Owners facing an administrative or judicial action for violation of the Fair Housing Act ("FHA") or other federal equal opportunity requirement (regardless of merit or stage of action) and owners found to have violated the FHA and other equal opportunity requirements are not eligible to receive Section 8 tenants. *Id*. at § 982.306(b). Owners that (1) violate a HAP contract, (2) commit fraud, bribery or another corrupt act in connection with a federal housing program, (3) engage in drug-related crimes, (4) have a history or practice of non-compliance with housing quality standards for units already leased under Section 8, (5) fail to evict tenants who violate terms of peaceful enjoyment, including tenant-made or guest-made threats to the owner, PHA employees or other tenants, or who engage in drug-related activities, (6) have a history of violating state and local housing codes and (7) that do not pay real estate taxes, are all ineligible for participation in Section 8. 24 C.F.R. § 982.306(c).

The federal government has made clear that the State, in passing a non-discrimination law, cannot "change or affect any requirement of this part, or any other HUD requirements for administration or operation of the program." 24 C.F.R.

§ 982.53(d).  Thus, PHA administrative plans and internal rules that are inconsistent with regulations are preempted, as are local laws which modify those regulations.

### III.  Prosecution of the Trust, its Trustee and its Beneficiary.

The Trust, through its trustee, Marcus Sakow, has violated and intends to continue to violate NYC Admin. Code § 8-107, which compels him to accept Section 8 tenants, and Shana Sakow, as trust beneficiary, and will continue that practice when the trust distributes its interest in its building to her personally.  (A-140; A-155.)  The Sakows do so because they believe the law is unconstitutional, want to protect their Fourth Amendment rights and do not want to see other landlords subjected to the same unlawful coercion by the City of New York.  (A-140; A-155.)

The Trust, through its trustee, Mr. Sakow, owns a residential real estate building with 48 rental units located at 216 East 29th Street, New York, NY.  (A-139.)  Ownership of the building will transfer to Trust beneficiary Shana Sakow in her own name upon the death of her mother.  (A-139; A-152.)  The Trust has never had a Section 8 tenant.  (A-140.)

On July 26, 2023, a prospective tenant named Dmitri Derodel contacted the Trust's property manager, Motley Management, Inc. (operating as "Homefront Management"), to inquire about renting an apartment from the Trust.  (A-140; A-142; A-154.)  Mr. Derodel informed Homefront Management that he had an Emergency Housing Voucher ("EHV") and wanted to use it to pay a portion of his

13

rent. (A-154.) EHVs are governed by Section 8. *See* HUD Emergency Housing Vouchers Frequently Asked Questions (available at https://www.hud.gov/sites/dfiles/PIH/documents/EHV_FAQs.pdf) ("EHVs are tenant-based vouchers under Section 8(o) of the United States Housing Act of 1937. Therefore, all regulatory requirements and HUD directives regarding the HCV program are applicable to EHVs, including the use of all HUD-required contracts and other forms."). Homefront Management initially told Mr. Derodel that the Trust did not participate in the EHV program. (A-142; A-154.) Mr. Derodel contacted the NYC Commission on Human Rights regarding the Trust's statement that it would not accept his voucher. (A-143; A-154.)

The Commission reached out to Homefront Management, informing the property manager that it was unlawful discrimination not to accept the EHV. (A-143; A-154.) Homefront Management was fearful of violating the law, so it subsequently indicated that it would accept the EHV. (A-143; A-154.) In fact, Homefront Management completed documentation required by the New York City Housing Authority ("NYCHA"), a PHA operating in New York City, applying to the EHV Section 8 program. (A-143; A-154.) NYCHA rejected the application because Homefront Management was not the titled property owner and insisted that the trustee execute the documentation in the name of the Trust. (A-143; A-155.) The trustee reviewed the documentation, learned that an EHV was a Section 8 voucher,

14

researched Section 8 vouchers and discovered that they required consent to searches, and, in consultation with the beneficiary, ultimately decided not to participate in the voluntary federal program.  (A-143; A-155.)

The Commission on Human Rights subsequently commenced an enforcement action against the Trust, trustee Mr. Sakow, his sister Ms. Sakow (who is the beneficiary of the Trust and manager of Homefront Management), an employee of Homefront Management named Debu Lama, and two unrelated entities whose names contain the words "Homefront Management" but which do not operate the Trust's building.  (A-143; A-146 – A-151.)  Mr. Derodel's verified complaint, which was prepared by the Commission, alleges that each of the respondents has "committed an unlawful discriminatory practice by refusing to rent or lease, and/or refusing to negotiate for the rental or lease of, or approve the rental or lease of a housing accommodation because of [Mr. Derodel's] lawful source of income in violation of § 8-107(5) of the Code."  (A-150.)  Further violations are alleged based on allegations: (a) that Mr. Derodel was denied equal terms, conditions and privileges of a housing accommodation because of his lawful source of income; (b) that it was further unlawful for the respondents to represent to Mr. Derodel that a housing unit was not available to him for rental or lease when it was still available due to his lawful source of income; and (c) that respondents violated NYC Admin. Code § 8-107(5) by "declaring, printing, or circulating a statement which expresses,

15

directly or indirectly, a limitation, specification, or discrimination because of a lawful source of income." (*Id*.)

## IV.   Procedural History.

Upon commencement of this action, the Trust named both the City of New York and the New York City Commission on Human Rights as defendants, seeking to enjoin the administrative agency from commencing prosecution of the Trust. The District Court denied the Trust's preliminary injunction motion, finding, *inter alia*, that it was barred by *Younger* abstention, ignoring the Trust's argument that it was seeking to have Local Law 10 declared unconstitutional on its face and the fact that no complaint had yet been filed against the Trust. (A-94 – A-95; A-86; A-71; A-242 – A-243.) Thereafter, the Trust amended its complaint to eliminate claims against the Commission on Human Rights, at which point non-party Safe Horizon, Inc. sought to intervene as a defendant. (A-98 – A-131; A-243.) The District Court, having broad discretion with respect to intervention, signaled its intention to permit intervention and allowed both the City of New York and Safe Horizon, Inc. to move to dismiss. (A-243.) The Trust opposed the motions to dismiss and cross-moved for summary judgment. (A-243 – A-244.) The District Court dismissed the case for lack of jurisdiction, on ripeness grounds and as an exercise of *Younger* abstention. (A-236 – A-256.)

## SUMMARY OF THE ARGUMENT

Local Law 10 is unquestionably unconstitutional. In fact, at least one court considering the same Fourth Amendment argument in connection with a New York State analog of the law applied statewide, found the statute unconstitutional on its face. *People v. Commons West, LLC*, 80 Misc.3d 447 (Sup. Ct. Tompkins Cnty. 2023), *renewal denied*, 224 N.Y.S.3d 364 (Sup. Ct. Tompkins Cnty. 2024) (making clear that the state statute is unconstitutional on its face, not just as-applied).[3] In an attempt to avoid the same fate that befell the New York State law, the City and Safe Horizon raised procedural and jurisdictional arguments, none of which should have been adopted by the District Court.

## I. Local Law 10 Violates the Fourth Amendment.

Coerced consent is, on its face, a violation of the landlords' Fourth Amendment rights. *See City of Los Angeles v. Patel*, 576 U.S. 409, 421 (2015) (citing *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 533 (1967)); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973) ("[T]he Fourth and Fourteenth Amendments require that consent not be coerced, by explicit or implicit means . . . ."). The combination of Section 8 regulations and the statute compelling participation forces landlords to grant consent on penalty of fine,

---

[3] The State's appeal in *People v. Commons West, LLC* is currently required be perfected on May 8, 2025.

injunction and criminal prosecution.  NYC Admin. Code §§ 8-126 and 8-129.  Once contractual consent to search is given, those wishing to conduct searches are free to do so without the need for a warrant (*New York v. Harris*, 495 U.S. 14, 16 (1990)), and the government will have consent in the form of a HAP contract.  (A-207.)

Not only is the Trust at risk of future coercion, the Commission on Human Rights is currently coercing it through the maintenance of litigation seeking to punish it for not participating in Section 8.  (A-146 – A-151; A-153 – A-154.) Among the factors in determining whether coercion exists is knowledge of the right to refuse consent.  *Schneckloth*, 412 U.S. at 227.  Here, the City's statute makes refusal of consent unlawful and is thus coercive on its face and as applied to every landlord.  NYC Admin. Code §§ 8-107(5) and 8-129.  The purpose of this lawsuit is not to obtain relief in the Commission on Human Rights litigation, but to free all landlords in the City of New York from the yoke of an unconstitutional law.

What Congress did with a carrot, the City of New York attempts to do with a stick.  The City compels participation in Section 8, and thus consent to search, threatening punishment and actually punishing landlords who do not participate. NYC Admin. Code §§ 8-107(5), 8-120, 8-126 and 8-129.  The City cannot do this because HUD and Congress did not include a method for the government to obtain warrants or otherwise provide for precompliance review of administrative searches

18

and instead required landlord consent to search as a condition of participation in Section 8.

## II. Local Law 10 is Preempted by Federal Statute and Regulation.

Section 8, and the regulations enacted to administer the program, only work if participation in Section 8 is voluntary—as Congress intended. *See Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293 (2d Cir. 1998). The federal government created Section 8 to provide housing to those unable to afford it by giving them access to privately-held housing rather than building additional government-owned housing. *See Paris v. Dep't of Hous. and Urban Dev.*, 843 F.2d 561, 563 (1st Cir. 1988) (describing the difference between Section 8 and public housing). Congress did so by creating incentives for landlords to participate, not by forcing their participation. *See Barrientos v. 1801-1825 Morton, LLC*, 583 F.3d 1197, 1203 (9th Cir. 2009) ("a key means to that end is the creation of incentives for private owners to participate in the section 8 program"). The entire regulatory scheme, including the need for inspections before the commencement of leases to confirm compliance with HQS, and the inspection of premises and landlords' books and records to prevent landlords from charging artificially high rent to Section 8 units, was created based on the understanding that landlords would consent to such searches in exchange for a government benefit. *See* 42 U.S.C. § 1437f(o)(6)(C) (assuming that owners will want to participate and may need to be turned away by

19

public housing authorities); *id.* at § 1437f(o)(8) (creating an inspection scheme without mention of owner consent because participation is voluntary and consent is assumed); *see also Poulos v. Pfizer, Inc.*, 244 Conn. 598 (Conn. 1998) (holding that consenting to searches for the purpose of obtaining a government benefit is a valid waiver of Fourth Amendment rights). Were it otherwise, and Section 8 was meant to work as a mandate, HUD and Congress would have had to build independent precomplaince review before administrators undertook searches. *See Paschow v. Babylon*, 53 N.Y.2d 687, 688 (1981); *Patel*, 576 U.S. at 421.

## III. The Trust's Claims are Not Subject to *Younger* Abstention.

*Younger* abstention only applies to as-applied challenges to the constitutionality of statutes, not to facial challenges, and the Trust's challenge here is facial. *See University Club v. City of New York*, 842 F.2d 2d 37, 40 (2d Cir. 1988). Contrary to the District Court's decision, the Trust is pursuing a facial challenge of Local Law 10 because it seeks to invalidate the law generally to free all landlords from its strictures. (A-109 – A-110.) The District Court incorrectly concluded that because the constitutionality of Local Law 10 requires it to be read in conjunction with the HUD regulations and contracts that it compels landlords to comply with and execute, the challenge is somehow as-applied, but it cited no caselaw on that point. (A-250.) In reaching its conclusion that there are enforceable and constitutional portions of Local Law 10, including the portions that require landlords to accept non-

Section 8 sources of payment, the District Court failed to recognize unconstitutionality can exist with respect to portions of a statute and that courts are directed to excise the unconstitutional portions while saving the rest. *See Barr v. Am. Ass'n of Political Consultants,* 591 U.S. 610, 623-26 (2020). The District Court further erred when it held that there were constitutional ways Local Law 10's compulsory participation in Section 8 provisions could be applied constitutionally without identifying any such scenario—because none exists. (A-250.)

## IV.    The Trust's Claims are Ripe.

The District Court ignored the facts of the instant case when determining that it was not yet ripe. (A-251 – A-252.) It adopted the holding of OATH, the administrative adjudicator of Commission on Human Rights complaints which listed contingencies that had to occur before a constitutional challenge would be ripe. (A-252.) However, the District Court ignored that the contingencies announced by OATH all occurred here. OATH, and by extension the District Court, held that for a claim to be ripe the landlord would first have to approve a Section 8 voucher holder, then the government agency would have to request consent, which the landlord would have to deny, and finally the Commission would have to bring charges and find probable cause of a statutory violation and commence a proceeding. (*Id.*) All of that has occurred here. The Trust told Mr. Derodel it would accept him as a tenant, after which it declined to execute documents that would contain its consent to search,

21

at which point the Commission on Human Rights filed a complaint against the Trust and related parties for source of income discrimination. (A-58 – A-60; A-146 – A-151; A-154 – A-155.) There is nothing abstract or contingent about this case. The Trust has staked out a position of refusing to participate in Section 8 because it will not agree to the initial HQS inspection and will not sign a HAP contract, and it is being prosecuted for that fact.

## V.    The Trust has Standing.

Standing exists as soon as a landlord is faced with the dilemma of either consenting to search or facing civil and criminal penalties. Myriad Supreme Court decisions, including those relied upon by the Trust in this case, hold that it is that dilemma, comply or face penalties, that violates the Fourth Amendment. *See Board of Educ. v. New York State Teachers Retirement Sys.*, 60 F.3d 106 (2d Cir. 1995); *Doe v. Putnam County*, 344 F. Supp. 3d 518, 533-34 (S.D.N.Y. 2018); *Patel*, 576 U.S. at 421; *Camara*, 387 U.S. at 525; *Sokolov v. Village of Freeport*. 52 N.Y.2d 341, 344 (1981). The government cannot make property owners choose between property and privacy rights and prosecution. Beginning in *Camara*, the Supreme Court has held that "business owners cannot reasonably be put to this kind of choice." *Patel*, 576 U.S. at 421 (citing *Camara*, 387 U.S. at 533).

The cases relied upon by the District Court, suggesting that a warrantless search must take place before a property owner has standing ignores the cases cited

above and relies on cases such as *Wirth v. City of Rochester* and *Flynn v. City of Lincoln Park* whose holdings do not apply to the facts here.

## ARGUMENT

### I.     Standard of Review.

The Trust seeks reversal of each of the District Court's findings with respect to jurisdiction, including the application of *Younger* abstention to its claims, the finding that its claims are not ripe, and the holding that the Trust lacks standing as it has not yet suffered an injury in fact.  The District Court's decision was based solely on the allegations in the Trust's complaint and Rule 56.1 statement.  Each of these findings by the District Court was made based on pleadings and is thus subject to *de novo* review.  *See Carter v. HealthPort Techs., LLC*, 882 F.3d 47, 56-57 (2d Cir. 2016); *see also Velez v. Sanchez*, 693 F.3d 308, 314 (2d Cir. 2012) ("we review 'questions of subject matter jurisdiction *de novo*'") (further citation omitted).

The Trust seeks reversal of the denial of its motion for summary judgment which is based entirely on questions of law and can be addressed in the first instance by this Court.  Appellees' arguments in favor of dismissal under Fed. R. Civ. P. 12(b)(6) and the Trust's arguments for summary judgment under Fed. R. Civ. P. 56 are both based on the existence of Local Law 10 and the constitutionality of that law.  If dismissal is denied, the Trust is entitled to summary judgment.  As such, a determination with respect to dismissal or the grant of summary judgment is a

23

question of law that the Court can and should consider *de novo*. *See Bigio v. Coca-Cola Co.*, 675 F.3d 163 (2d Cir. 2012) (resolving both a motion to dismiss and competing motion for summary judgment denied as moot); *see also Velez*, 693 F.3d at 313-14 ("[w]e also review the district court's summary judgment decision . . . *de novo* and apply 'the same standards that govern the district court's consideration of the motion.'") (further citation omitted).

## II.   The Trust's Challenge is Facial and Free from *Younger* Abstention.

The Trust has raised a facial challenge to the constitutionality of Local Law 10 that applies equally to all landlords who refuse to participate in Section 8 in contravention of that law and is thus not subject to *Younger* abstention. Consistent with this Court's decision in *University Club v. City of New York*, the District Court recognized that *Younger* abstention does not apply to facial challenges. (A-249.) In *University Club*, this Court held that the availability of CPLR Article 78 review was sufficient to prevent the application of an unconstitutional law to the University Club, but noted that an Article 78 proceeding cannot be used to raise constitutional challenges to legislative enactments generally. 842 F.2d at 40-41. As a result, courts should not abstain from hearing facial constitutional challenges where the plaintiffs are parties to administrative proceedings regarding those statutes. *See Meyers v. Health & Hosp. Corp.*, 14-CV-7448 (CBA), 2016 WL 2946172 at *11 (E.D.N.Y.

24

May 18, 2016) (*Younger* abstention does not apply to facial challenges); *Cecos Int'l., Inc. v. Jorling*, 706 F.Supp. 1006, 1018-19 (N.D.N.Y. 1989) (same).

Contrary to the finding of the District Court, the fact that Local Law 10 must be read in conjunction with Section 8 regulations does not render its challenge as-applied or dependent on facts specific to the Trust or any prospective tenant. Local Law 10 presents a unique circumstance not found in the precedent relied on by the District Court or Defendants—it specifically invokes the Section 8 statute and regulations, mandating compliance with them. NYC Admin. Code § 8-102 (including Section 8 vouchers in the definition of Lawful Source of Income) § 8-107 (prohibiting discrimination based on lawful source of income). The NYC Admin. Code incorporates Section 8 statutes and regulations by reference and turns landlord compliance with them from voluntary to mandatory. *Id.* Nothing about that fact converts the Trust's challenge from facial to as-applied. *See Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759-60 (1988) (combining two aspects of a regulatory scheme to determine constitutionality). Local Law 10 cannot be divorced from the requirements of the very statute and regulations the compliance with which it mandates of landlords.

Neither Defendants nor the District Court posited any situation in which a landlord might comply with Local Law 10 while refusing to participate in Section 8, and as such the facts of any landlord's case need not be considered when determining

25

whether Local Law 10 is constitutional. Of course there are landlords who are debarred from participation in Section 8, and those whom Section 8 regulations deem ineligible. However, when considering whether a plaintiff may mount a facial challenge, courts are not to consider voluntary compliance or impossibility as evidence that statutes have constitutional application. *Patel*, 576 U.S. at 418 (citing *Planned Parenthood v. Casey*, 505 U.S. 833, 894 (1992) ("The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant")). In the context of *Casey*, Pennsylvania law did not impact most of society, including men, women not of child-bearing age, or even women who were or could become pregnant but did not wish to terminate their pregnancies. The fact that Local Law 10 does not impact non-property owners, commercial landlords, and even those for whom participation in Section 8 would be unlawful, is of no consequence when determining the scope of the Trust's challenge.

The City's and District Court's reliance on *Field Day, LLC v. County of Suffolk* does not carry the day. This Court was clear in *Field Day* that a facial challenge is one in which the court considers the text of the law and not the individual circumstances in which it might be applied. 463 F.3d 167, 174 (2d Cir. 2006). Facial challenges were distinguished from as-applied challenges which apply to statutes which are constitutional on their face but have been applied in unconstitutional ways. *Id*. However, the *Field Day* court did not decide whether the event promoter in that

26

case was bringing a facial vs. as-applied challenge (*id*. at 174-76) and instead analyzed the merits of both claims. *See generally id*. Likewise, the Second Circuit's determination that the statute was not facially unconstitutional was not based on the fact that some other law or regulatory scheme was invoked or incorporated into the statute. *Id*. at 176-82. The District Court's reliance on its own decision in *Geller v. Cuomo*, cannot be viewed as support for proposition that where a statute mandates participation in a federal program and requires compliance with its regulatory scheme, no facial challenge can be mounted. 476 F. Supp. 3d 1, 13 (S.D.N.Y. 2020). *Geller* merely involved analysis of whether a statute was content neutral and thus safe from a facial challenge under the First Amendment. *Id*. It has no application here.

The fact that many aspects of the statute might be constitutional does not hinder the Trust's ability to lodge a facial challenge with respect to a portion of the law. Local Law 10 is unconstitutional on its face to the extent Section 8 vouchers are defined as a source of income, and courts can enjoin enforcement of the facially unconstitutional portion of the statute or order through severance. *See Barr,* 591 U.S. at 623-26 (discussing when an unconstitutional portion of a law can be severed from the balance of the statute and the strong presumption of severability). Here, removing reference to Section 8 in NYC Admin. Code § 8-102's definition of lawful

27

sources of income would render the remainder of NYC Admin. Code Article 8 enforceable with respect to other sources of income.

## III. The Trust's Fourth Amendment Claim is Ripe.

The Trust is being prosecuted for asserting its Fourth Amendment rights. (A-146 – A-151.) It will face civil penalties and civil and criminal contempt orders when it refuses to comply with the Commission's eventual orders to participate in Section 8. The Trust's claims are based on more than the threat of a warrantless search, they are based on the near certainty that they will be found liable for discrimination under Local Law 10 as a result of their civil disobedience in the name of protecting their Fourth Amendment rights. The Supreme Court has long held that landlords cannot be forced to choose between punishment and their Fourth Amendment rights. *Camara*, 387 U.S. at 533. It reiterated that point again in *Patel* in the context of hoteliers. 576 U.S. at 421 ("A hotel owner who refuses to give an officer access to his or her registry can be arrested on the spot. The Court has held that business owners cannot reasonably be put to this kind of choice."). The New York Court of Appeals took those holdings to their logical conclusion in *Sokolov*, 52 N.Y.2d at 346 ("A property owner cannot be regarded as having voluntarily given his consent to a search where the price he must pay to enjoy his rights under the Constitution is the effective deprivation of any economic benefit from his rental property."). The Defendants seek to skirt those holdings by suggesting that landlords

cannot sue to protect their rights until after searches have occurred. However, no search occurred in *Camara*, *Patel* or *Sokolov*, and courts were permitted to step in and defend the Constitution from overreaching local laws.

Defendants' and the District Court's reliance on a decision from OATH demonstrates their misunderstanding of the issues and facts here. (A-252.) OATH resolved the ripeness question by suggesting that a landlord would first have to approve a Section 8 voucher holder for an apartment, then the government would have to seek consent to search, the landlord would deny consent and finally the government agency would have to decide to prosecute for denying consent. *Comm'n Human Rights ex rel. Watson v. PPC Residential*, OATH Index Nos. 2245/19, 2246/19, Memorandum Decision (Sept. 11, 2023), https://archive.citylaw.org/wpcontent/uploads/sites/17/oath/19_cases/19-2245md.pdf. The District Court's holding (A-242) is inconsistent with the clear precedent that even making a landlord choose between compliance and its rights is a Constitutional violation. *Patel*, 576 U.S. at 421. It also ignores the fact that all of the contingencies relied upon by OATH have already occurred in this case. First, the Trust agreed to rent to Dmitri Derodel who asked to use a Section 8 voucher to supplement his rent. (A-154.) Then, when asked to sign documents consenting to search, including the Section 8 application which would have resulted in a pre-lease HQS inspection, the Trust refused to consent. (A-155; A-58 – A-60.) Finally, the Commission on Human Rights brought

29

charges against the Trust and its trustee, beneficiary and others for refusing to participate in Section 8 and consent to searches. (A-146 – A-151; A-155.) Those charges remain pending.[4]

## IV. The Trust has Standing to Pursue its Claim.

The Trust faces impending injury in the form of prosecution and conviction for refusal to comply with an unconstitutional law. Courts have long granted standing to parties who face a choice or dilemma between asserting their Constitutional rights and complying with a law. *See Board of Educ.*, 60 F.3d 106 (citing *Board of Educ. v. Allen*, 392 U.S. 236, 241, n. 5 (1968)) (explaining that public officials have standing when they are forced to decide between their oath to uphold the Constitution, which could result in expulsion from office and compliance with the statute in violation of their oath); *see also Doe*, 344 F. Supp. 3d at 533-34 (holding that plaintiffs who wished to possess firearms were left the choice of either not seeking a firearm license or submitting false applications, both of which caused concrete injuries in fact that gave rise to standing). In fact, it is the dilemma that gave rise to standing in many of the substantive cases relied on by the Trust here. In *Patel*, the motel owner had to decide between turning over his guest registry or going to jail. 576 U.S. at 421 ("A hotel owner who refuses to give an officer access to his

---

[4] Despite the fact that the District Court declined to enjoin prosecution, the Commission appears to be taking a wait and see approach pending the outcome of this case before moving forward.

or her registry can be arrested on the spot.").  In *Camara*, the plaintiff brought action "alleging that he was awaiting trial on a criminal charge of violating the San Francisco Housing Code by refusing to permit a warrantless inspection of his residence," arguing that the statute authorizing the inspection without a warrant was unconstitutional on its face.  387 U.S. at 525.  Again, the same dilemma appears in *Sokolov*, "each of the appellants [was] presently being prosecuted in criminal actions in the Freeport Village Justice Court for failure to obtain rental permits under the ordinance." 52 N.Y.2d at 344.  Beginning in *Camara*, the Supreme Court has held that "business owners cannot reasonably be put to this kind of choice."  *Patel*, 576 U.S. at 421 (citing *Camara*, 387 U.S. at 533).  The Trust faces the same dilemma here, and like its predecessors it has chosen to subject itself to prosecution rather than to succumb to coercion.  (A-143; A-155.)  Notably, had the Trust instead complied with Local Law 10, the Defendants would be arguing that it did so voluntarily in exchange for a government benefit, faced no risk of a search without consent due to that consent and lacked standing.  It is the imposition of this dilemma that the Supreme Court says is an unconstitutional injury to property owners.

There is no requirement that a search in violation of the Fourth Amendment must occur before a plaintiff has standing to challenge a law compelling consent to search.  The only authority that the District Court or Defendants could point to in support of its argument that the search must first occur was *Wirth v. City of*

31

*Rochester*.  Case # 17-CV-6347-FPG; 2020 U.S. Dist. LEXIS 180289 (W.D.N.Y. Sep. 30, 2020) and *Flynn v. City of Lincoln Park*, 2:15-cv-12187, 2020 U.S. Dist. LEXIS 9433 (E.D. Mich. Jan. 21, 2020).  Both cases are easily distinguished.

*Wirth* is distinguishable because the property owner could not allege any risk of future harm from the unconstitutional statute because he sold his property to avoid the threat of future searches.  *Wirth*, 2020 U.S. Dist. LEXIS 180289 at \*12-\*13.  The plaintiff's speculative intention to purchase another property in the City of Rochester was found insufficient to create standing.  *Id*. at \*13.  The only concrete injury that the plaintiff could point to was the expenditure of legal fees defending an illegal prosecution for failure to consent to search.  *Id*. at \*11.  The *Wirth* court simply made a distinction between monetary harm in the form of attorneys' fees and Fourth Amendment harm in the form of a coerced or compelled search.  *Id*. at \*11-\*12. *Wirth* is very different from the instant case where the Trust and its trustee and beneficiary are presently being prosecuted, the Trust still owns the subject property and both are likely to face further future prosecution every time they deny the application of a prospective tenant who wishes to apply a Section 8 voucher toward rent.

*Flynn* is distinguishable because the statute at issue in that case was ambiguous with respect to its requirement that property owners' consent to search, and there was no attempt to prosecute the property owner for refusing to consent.

*Flynn*, 2020 U.S. Dist. LEXIS 9433 at \*4. In that case, the challenged provision of the law was language stating that "[i]f entry is refused, the code official shall have recourse to the remedies provided by the law to secure entry." *Id*. The building inspector did not simply search buildings as part of the "remedies provided by the law" and the property owner was not prosecuted for failure to consent to entry. *Id*. at \*9-\*10. The *Flynn* court believed that those "remedies provided by the law" were only to obtain a warrant, not to coerce consent, noting that such language created an express warrant procedure. *Id*. at \*17. When resolving the standing question in *Flynn*, the district court relied on cases where the only consequence of refusing to consent to search was the loss of a rental license. *Id*. at \*19-\*20. An important point in denying standing in *Flynn* was the fact that the city was not prosecuting the property owner. *Id*. at \*20. The *Flynn* court distinguished that case from one where a property owner was issued fines for non-compliance with search. *Id*. at \*19.

Here, the Trust has standing because it is being prosecuted for refusing to participate in Section 8 because participation requires consent to search. (A-146 – A-151.) The Commission on Human Rights found probable cause after this matter was submitted to the District Court, and OATH will undoubtedly find the Trust violated the statute because it has and will continue to refuse to participate in Section 8 on Fourth Amendment grounds. (A-143; A-155; A-234.)

33

## V. Local Law 10 Violates the Fourth Amendment.

### A. Existing Case Law Renders Local Law 10 Unconstitutional.

In *Camara*, the Supreme Court established that administrative inspections are searches governed by the Fourth Amendment, and that state law cannot deprive citizens of those Fourth Amendment rights under threat of penalty. 387 U.S. at 534. In other words, consent to search cannot be obtained under threat, coercion or compulsion. *See generally id.* Courts across the country have followed the *Camara* holding for decades. *Thompson v. City of Oakwood, Ohio*, 307 F.Supp.3d 761, 772 (W.D. Ohio 2018) (striking down a law that required consent to pre-sale inspection of real property on threat of penalty); *Baker v. City of Portsmouth*, 1:14cv512, 2015 WL 5822659 (S.D. Ohio Oct. 1, 2015) (same); *Cullen v. Village of Pelham Manor*, No. 03-CV-2168, 2009 WL 1507686 (S.D.N.Y. May 28, 2009) (citing *Camara* and *Sokolov* approvingly); *Dearmore v. City of Garland*, 400 F.Supp.2d 894, 904 (N.D. Tex. 2005) (finding an inspection statute that does not give an opportunity to refuse consent unconstitutional); *Makula v. Village of Schiller Park, IL*, No. 95 C 2400, 1995 WL 755305 and 1998 WL 246043 (N.D. Ill. Dec. 14, 1995 and Apr. 30, 1998) (striking down a coerced consent statute as unconstitutional); *Wilson v. City of Cincinnati*, 346 N.E.2d 666 (Ohio 1976) ("the import of *Camara* is that the Fourth Amendment prohibits placing appellant in a position where she must agree to a

warrantless inspection of her properly or face a criminal penalty"); *State v. Finnell*, 685 N.E.2d 1267, 1271 (Ohio Ct. App. 1996).

In New York, the Court of Appeals has long held that a statute compelling a landlord to consent to searches as a condition of owning and operating residential real estate violates the Fourth Amendment. *Sokolov*, 52 N.Y.2d 341. *Sokolov* has been followed in New York many times to find local laws facially unconstitutional. *See e.g. ATM One, LLC v. Incorporated Village of Hempstead*, 91 A.D.3d 585, 587 (2d Dep't 2012); *Town of Brookhaven v. Ronkoma Realty Corp.*, 154 A.D2d 665 (2d Dep't 1989); *People v. Commons West, LLC*, 224 N.Y.S.3d 364 (Sup. Ct. Tompkins Cnty. 2024); *People v. Commons West, LLC*, 80 Misc.3d 447 (Sup. Ct. Tompkins Cnty. 2023); *Losquadro v. Incorporated Village of Sea Cliff*, 36 Misc.3d 1214(A) (Sup. Ct. Nassau Cnty. 2012); *People v. James H. Northrop, Inc.*, 106 Misc.2d 440, 441 (App. Term. 2d Dep't 1980).

As explained above, the City of New York requires landlords to participate in Section 8 by defining Section 8 vouchers as a lawful source of income (NYC Admin. Code § 8-102), and then making it unlawful discrimination for landlords to refuse tenants who have a lawful source of income. NYC Admin. Code § 8-107(5). It subjects them to fines of up to $250,000 for willful violations. NYC Admin. Code § 8-126. The failure to comply with an order to accept Section 8 tenants gives rise to criminal penalties. NYC Admin. Code § 8-129. The City requires landlords to

comply with each of the provisions of HUD's regulations, essentially incorporating their requirements into City law. That includes making apartments available for HQS inspections (24 C.F.R. § 982.305(b)) and executing a HAP contract. 24 C.F.R. § 982.162(a)(2). H AP contracts contain consent to a broad array of searches. (A-204; A-207.)

From HUD's perspective, landlords who apply to accept Section 8 tenants and ultimately execute HAP contracts are doing so consensually in exchange for a government benefit—government payment of a portion of a tenant's rent. The waiver of Fourth Amendment rights by contractually consenting to searches in exchange for a government benefit does not run afoul of the Constitution. *See Sellers v. Contino,* 327 F. Supp. 230, 234-35 (E.D. Pa. 1971) (enforcing consent granted in a lease); *Poulos,* 244 Conn. at 598 (consent to searches for the purpose of obtaining a government benefit is a valid waiver of Fourth Amendment rights). Where parties sign leases consenting to inspections, Fourth Amendment rights have been waived. *See Evans v. Lucas Metropolitan Housing Auth.,* 3:15 CV 389, 2016 WL 7407539 (N.D. Ohio Dec. 22, 2016); *see also Abateco Servs., Inc.,* 23 Va. App. 504 (Va. Ct. App. 1996) (concluding that consent to waive Fourth Amendment rights given in a contract cannot be withdrawn). However, the Trust's arguments do not turn on the enforceability of the waiver in the HAP contract because the mere fact that such waiver was compelled or coerced makes the statute facially unconstitutional.

36

*Camara*, 387 U.S. at 540. Thus, even though the Second Circuit found a coerced contractual consent unenforceable in *Anobile v. Pelligrino*, the law requiring consent to be provided could still have been found unconstitutional. 303 F.3d 107 (2d Cir. 2001) (finding that consent to search dormitories was coerced in violation of the Fourth Amendment, and "that the demand embodied by the waiver provision in the license application is unreasonable" essentially invalidating the statute requiring the waiver).

### B. The Trust Has Protectable Fourth Amendment Interests.

The Trust, its trustee and its beneficiary are concerned about inviting administrative agents and the federal government into the apartment units the Trust puts up for rent as well as the far-reaching nature of the consent in the HAP contract. (A-141; S. A-153.) Of particular concern is the HAP contract's provision providing consent to searches of books and records and any devices containing such records, as well as all facilities containing those books and records. (A-141.) That consent is so broad, it could expose the trustee's and trust beneficiary's homes and smart phones to government search, along with computers maintained in those homes. (A-141 – A-142.) The Defendants have not tried to argue that landlords such as the Trust,

its trustee and its beneficiary lack a privacy interest in their homes or personal electronic devices.[5]

The trustee and beneficiary have an expectation of privacy with respect to their homes and electronic devices despite the potential presence of Trust books and records therein. The question of privacy within the home should not be in dispute. *See Collins v. Virgina*, 584 U.S. 586, 592-93 (2018) (describing the home as the place where privacy expectations are most heightened); *United States v. McKenzie*, 14 F.4th 223, 235 (2d Cir. 2021) ("The expectation of privacy reaches its zenith in the home."). There is ample case law supporting the expectation of privacy in the contents of electronic devices. *See generally Riley v. California*, 573 U.S. 373 (2014) (detailing the myriad information contained on mobile phones and the reasonable expectation of privacy therein); *see also Kunstler v. Central Intelligence Agency,* 22-cv-6913 (JGK), 2023 WL 8776339 at *9 (S.D.N.Y. Dec. 19, 2023) (holding that the CIA plausibly violated Fourth Amendment rights by accessing the contents of mobile phones without consent or a warrant). The same reasonable expectation of privacy applies to home computers, even if they might also contain information relating to the landlord's operations. *United States v. Lifshitz*, 369 F.3d

---

[5] Even if the Trust posted videos of the insides of apartments on the Internet, as the Defendants alleged below, such videos only showed what the Trust chose to share, the insides of apartments at a certain point in time. It is entirely possible that after videos were made, conditions of the apartments, or objects stored in the apartments, changed. That point in time disclosure is not a waiver of Fourth Amendment rights.

173 (2d Cir. 2004) ("[i]ndividuals generally possess a reasonable expectation of privacy in their home computers"); *see also Leventhal v. Knapek*, 266 F.3d 64, 73 (2d Cir. 2001) (providing for a reasonable expectation of privacy in an office computer owned by an employer); *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F.Supp.2d 548, 560 (S.D.N.Y. 2008) (upholding privacy protections for private e-mail accessed on a work computer); *Curto v. Medical World Communications*, No. 03-Civ. 6327 (DRH) (MLO), 2006 WL 1318387 at *6 (E.D.N.Y. May 15, 2006) (finding a reasonable expectation of privacy in a work-owned computer located in the employee's home).

## C. Searches, Even with a Special Needs Exception, Require Precompliance Review.

The special needs exception does not eliminate the need for precompliance review. The most recent and most applicable pronouncement from the Supreme Court on the special needs exception was in *Patel*. 576 U.S. at 420. Justice Sotomayor, writing for the Court in *Patel*, explained that a special need cannot eliminate a warrant requirement without replacing it with precompliance review. *Id*. at 420 and 426 (requiring "a constitutionally adequate substitute for a warrant"). Section 8 regulations do not provide for any precompliance review. *See generally* 24 C.F.R. 982 *et seq*.

Application of the special needs exception requires a balancing of governmental and privacy interests to assess the practicality of warrant and probable

39

cause requirements. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989). Categories of "special needs" include searches involving probationers, searches of closely regulated businesses, work-related searches of employees' desks and offices, searches of student property by school officials and body cavity searches of inmates. *Id*. at 620 (collecting cases). There are only four closely regulated industries where no expectation of privacy exists, none of which is residential real estate. *Patel*, 576 U.S. at 424. Even if New York City residential real estate were sufficiently closely regulated, the Defendants would have to show that warrantless inspections are necessary to further the regulatory scheme. *Patel*, 576 U.S. at 426 (citing *New York v. Burger*, 482 U.S. 691, 702 (1987)). Courts typically look at the risk the government faces from delay if a warrant procedure is required. *Patel*, 576 U.S. at 427. The risk that evidence could be altered or absconded during a warrant application is not sufficient. *Id*. Other courts have already found that with respect to the inspection of portions of residential real property not used for housing tenants (such as utility rooms and floors which are part of the "premises" covered by the HAP contract), the government does not have a sufficiently compelling need to inspect those spaces without a warrant. *See e.g. Brower v. Village of Bolingbrook*, 735 F.Supp. 768, 777 (N.D. Ill. 1990). The City cannot justify setting aside the need for a warrant or some sort of precompliance review.

### D. The City's Administrative Warrant Law Does Not Save it Here.

NYC Admin. Code § 27-2123(a) does not create a warrant or precompliance review rule that would save Local Law 10. Title 27 of the NYC Admin. Code is only applicable to the Department of Buildings, not NYCHA. The operative rules governing NYCHA's operation of Section 8 are found in its administrative plan. NYCHA Administrative Plan (available at https://www.nyc.gov/assets/nycha/downloads/pdf/hcpvadministrative.pdf). Nowhere in the administrative plan is there a procedure for warrant application or precompliance review in the event a building owner refuses to allow an inspection or administrative search. *Id*. The NYCHA administrative plan provides that "[p]articipants are required to allow access to their apartments for a Section 8 inspector to conduct an HQS inspection." *See id*. at 34. Throughout the administrative plan, the word "participant" is used in place of "tenant," not "owner," which is separately defined. *See id*. at 45 (separately defining owners). Nowhere in the Administrative Plan is there any discussion of what process should be followed if an owner refuses entry to a building, likely because owner consent is secured in the HAP contract and presumed by the fact that the owner has elected to participate in the voluntary federal program. *See generally id*. More importantly, there is nothing in the administrative plan allowing owners to take on Section 8 tenants without signing HAP contracts consenting to searches. *See generally id*.

41

NYC Charter § 398 does not provide a warrant-based alternative to consent either. Section 398 allows corporation counsel to make ex parte warrant applications but does not require the City to make a warrant application, noting that "[n]othing in this section shall be construed to limit, abridge, affect or amend the power of an agency under law, including state, local or case law, to enter and inspect any location or premises . . . *either with or without a warrant*, to carry out any of its functions, powers and duties." (emphasis added). It does not serve as an alternative to coerced consent to inspection.

Section 398 does not resemble the type of warrant provisions that were used to save other inspection schemes. For example, in *Wirth*, the City of Rochester provided landlords a choice of either consenting to an administrative search to obtain a certificate of occupancy or checking "no" on an application form, at which point the code enforcement officer could apply for a warrant before conducting the inspection necessary to issue a certificate of occupancy. *Wirth*, 2020 WL 5814417 at \*2-\*3. This gave property owners an alternative to consenting to search that, as the court found, would not result in any penalty for not possessing a certificate of occupancy. *See also Metropolitan Omaha Property Owners Association, Inc. v. City of Omaha, Neb.*, 8:19CV431, 2019 WL 7049104 at \*4-5 (D. Neb. Dec. 23, 2019) (explaining that where a landlord is given an option not to consent to a search, with express language indicating that no penalty will be assessed for refusal to consent,

42

there is no coercion). Section 398 does not allow landlords to opt out of executing a HAP contract or require NYCHA, HUD and the Comptroller General to apply for a warrant where a HAP contract is not executed.

Landlords facing pressure from the Commission on Human Rights to accept Section 8 voucher holders as tenants do not have the option of refusing to sign the HAP contract or refusing a HQS inspection. The City's warrant provision, if applicable at all, only affects later requests by NYCHA to conduct actual inspections, at which point the landlord will have already been forced to consent to inspections by signing a HAP contract, obviating the need for a warrant in the first place. As such, the warrant provision does not save the City from facial unconstitutionality. *See Crook v. City of Madison*, 168 So.3d 930, 938-39 (Miss. Sup. Ct. 2015) (finding unconstitutional a law containing a warrant provision where the application of a warrant could rely on the coerced advance consent provided in a lease or rental agreement).

NYCHA, the City's public housing authority, is not the only PHA operating in New York City. HCR operates in New York City through NYS Homes & Community Renewal Subsidy Services Bureau. (*See* https://hcr.ny.gov/section-8-housing-choice-voucher-hcv-program). HCR is not bound by the City Administrative Code. *See Love v. Port Authority of New York and New Jersey*, 168 A.D.2d 222, 222 (1st Dep't 1990) ("Port Authority functions as a State agency . . .

43

exempt from municipal regulation."). HCR does not have its own warrant procedure for the five counties within New York City. HCR Administrative Plan at Part II (available at https://hcr.ny.gov/system/files/ documents/2024/02/hcr-nma-version-admin-final-02.09.24.pdf). Importantly, neither HUD nor the United States Comptroller General are bound by a New York City law. U.S. Const. Art. VI, ¶ 2. Because the HAP contract contains consent to searches by the federal government, the City and NYCHA cannot simply amend their law or administrative plan to require applications for warrants before inspections because those rules will not bind the federal government.

There is another reason the City cannot use its warrant provision or change NYCHA's administrative plan to avoid the strictures of Section 8 regulations. The City is expressly preempted from passing local laws which change or affect any requirement for the administration or operation of the federal Section 8 program. 24 C.F.R. § 982.53(d); *see City of New York v. FCC*, 486 U.S. 57, 63 (1988) ("The [Supremacy Clause] phrase 'Laws of the United States' encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization."). The City cannot, through operation of local law, modify the terms of the HAP contract. 24 C.F.R. §§ 982.162(b) and 982.451(a)(1).

44

**VI.    NYC Admin. Code § 8-107 is Preempted by Federal Law and Regulations.**

NYC Admin. Code § 8-107 is in conflict with 42 U.S.C. § 1437f and the regulations issued pursuant thereto.  There is both an actual conflict, under which compliance with both the federal and City statutes is impossible, and an obstacle conflict because the City's provision conflicts with the purpose and intended effects of the federal statutory and regulatory scheme.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and ***intended effects***" (emphasis added)).

**A.    An Actual Conflict Exists, Making Compliance with NYC Admin. Code § 8-107 Impossible.**

Certain categories of landlords are excluded from participation in Section 8. That list includes those for whom participation would be a conflict of interest, as well as a broad swath of landlords who may become debarred or otherwise ineligible to participate. 24 C.F.R. § 982.161(a). In fact, the NYCHA Administrative Plan recognizes that several categories of landlords cannot participate in Section 8. New York City Housing Authority Housing Choice Voucher Administrative Plan, available at https://www.nyc.gov/ assets/nycha/downloads/pdf/hcpvadministrative .pdf ("NYCHA Administrative Plan").  The list is derived from Section 8 regulations and statute discussed above. *Id*.  NYC Admin. Law § 8-107(5) not only requires all

45

landlords to participate in Section 8, it makes it illegal discrimination for landlords to advertise or announce to the public that they do not take Section 8 tenants. NYC Admin. Law § 8-107(5)(a)(2). However, landlords who find themselves on the list of those excluded from participation would not only be prevented from accepting Section 8 voucher holders as tenants, but also would be barred from disclosing their inability to accept Section 8 tenants under NYC Admin. Law § 8-107(5)(a)(2). The two statutes cannot be read congruently such that conflict preemption does not apply.

NYC Admin. Law § 8-107 lends itself to another explicit and insurmountable conflict applicable to all landlords. Landlords who do not wish to participate in Section 8 could go through the farce of attempting to participate, then intentionally breach a HAP contract or otherwise get themselves debarred, with the end result of simultaneously being prohibited from participation by Section 8 statute or regulation. However, the Commission on Human Rights would probably take the position that this was a violation of NYC Admin. Code § 8-107 for intentionally taking the steps leading to ineligibility. Such events would create a conflict under which it would be impossible to comply with both federal and city statutes. The Court must find an actual conflict here to avoid that absurd result.

### B. NYC Admin. Code § 8-107 is an Obstacle Because it Undermines the Intended Effect of the Section 8 Statute and Regulations.

Voluntary participation is a key component of the Section 8 legislation and regulation such that laws making participation compulsory are preempted. The

46

voluntary nature of Section 8 is clear. *See* 24 C.F.R. § 982.302(b) (providing that tenants may rent units where "the owner is willing to lease the unit under the program"). The Supreme Court requires courts to look at not just the primary purpose of a federal law but the "full purposes and objectives," focusing on "intended effects." *Crosby*, 530 U.S. at 373 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). There can be no doubt that Congress's intended effect with respect to Section 8 was to create a voluntary program. The Second Circuit recognized this in *Salute*, finding that Section 8 participation was intentionally voluntary. 136 F.3d at 298. In fact, this Court could not have been clearer that "[p]articipation by landlords is voluntary; they may lawfully refuse to accept applications from Section 8 beneficiaries." *Id*. at 296. The *Salute* court recognized that for a time, Congress put in place a "take one, take all" provision that made it unlawful for landlords to refuse to rent to people because they were Section 8 voucher holders assuming they already had at least one Section 8 tenant. *Id*. at 297. The panel in *Salute* found that the purpose of 42 U.S.C. § 1437f(t), now repealed, was "to promote access to decent and affordable housing for lower income households." *Salute*, 136 F.3d at 297. Working from the premise that "landlords have a statutory right to avoid Section 8 participation," the *Salute* court found it absurd to require landlords to evict existing tenants who convert to Section 8 to avoid having to take future Section 8 tenants. *Id*. at 298. This Court's belief in the voluntariness of Section 8 was informed by the

47

fact that landlords opting to participate would have to sign "required contracts with HUD" and subject themselves to a "cumbersome process of terminating leases." *Id*. In fact, the Second Circuit recognized that by repealing the "take one, take all" provision found in 42 U.S.C. § 1437f(t), Congress's purpose was to make participation more attractive to landlords. *Id*.

This conclusion is supported by the legislative history. The House Committee on Banking and Financial Services, discussing the repeal of the "take one take all" and "endless lease" provisions, stated that:

> these and other revisions contained in H.R. 2406 will eliminate some of the most egregious conditions that have caused owners dissatisfaction with choice-based housing, while retaining needed tenant protection. Furthermore, these changes will encourage other apartment owners to participate in the program, thereby expanding the universe of affordable housing for low-income families.

H.R. Rep. 104-461 (Feb. 1, 1996); 1996 WL 49946. This is a clear expression of Congressional intent that landlords have to be "encourage[d]" to participate in the program because it is not compulsory.

Other circuit, district and state courts have concurred that Section 8 is intentionally voluntary and designed to create economic incentives for landlord participation as opposed to compelling participation. *See Isham v. Pierce*, 694 F.2d 1196, 1198 at n. 4 (9th Cir. 1982) ("Section 8 was designed to provide a profit incentive for private developers to participate in the construction and management

48

of lower income housing by using monthly housing assistance payments in the form of rent subsidies."); *see also Conway v. Harris*, 586 F.2d 1137, 1138 (7th Cir. 1978) (citing S.Rep.No.93-693, 93d Cong., 2d Sess., Reprinted in (1974) U.S. Code Cong. & Admin. News, pp. 4273, 4275); *Knapp v. Smiljanic*, 847 F.Supp. 1428, 1435 (W.D. Wis. 1994) ("That Congress intended to treat landlords as entrepreneurs is evident from the structure of the Section 8 program. The program is voluntary and includes incentives to persuade landlords to participate."). Minnesota recognizes the voluntariness of participation. *See Edwards v. Hopkins Plaza Ltd. Partnership*, 738 N.W.2d 171 (Minn. Ct. App. 2010). Likewise, the State of Connecticut, citing Senate Report 93-693 (1974), concluded that a purpose of Section 8 was to provide landlord incentive. *See Atlantic Mortg. And Inv. Corp. v. Pervis*, 21 Conn. L. Rptr. 619 (Conn. Sup. Ct. 1997).

Courts have found that mandatory participation in Section 8 is preempted. *See Mother Zion Tenant Ass'n v. Donovan*, 55 A.D.3d 333 (1st Dep't 2008). The First Department specifically held that Congress sought to entice landlords to participate in Section 8, and that "the federal section 8 program is a voluntary one, based on incentives." *Id*. at 334. The First Department specifically invoked the Constitution's Supremacy Clause and found an actual preemptive conflict between City law and Section 8. *Id*. at 335-36. In doing so, it held that "Local Law 79, which requires owners to either remain in section 8 or sell their property to tenants at a rate set by a

49

panel of appraisers, ***actually conflicts with the federal regime of an entirely voluntary program*** with inducements to encourage owners to remain in section 8." *Id*. at 336 (emphasis added). The Appellate Division was clear that "converting a voluntary federal program into a mandatory one would frustrate congressional objectives." *Id*.

Decisions to the contrary, cited by Defendants, are not on point. In *Rosario* v. *Diagonal Realty, LLC*, the Court of Appeals found that once a landlord consensually entered into a HAP contract and admitted a Section 8 tenant in a unit governed by New York City's Rent Stabilization Code (9 N.Y.C.R.R. § 2522.5(g)(1)), which required the landlord to offer the tenant a new lease containing the same terms and conditions as a prior lease, the landlord was barred from subsequently removing the Section 8 tenancy addendum from the lease, effectively requiring it to continue to participate in Section 8. 8 N.Y.3d 755, 761-62 (2007). *Kosoglyadov* v. *3130 Brighton Seventh, LLC* involved a landlord that voluntarily took a 20-year J-51 tax abatement under the NYC Admin. Code, which barred discrimination against tenants with Section 8 vouchers. 54 A.D.3d 822, 823-24 (2d Dep't 2008) (*citing* NYC Admin. Code § 11-243(k) and establishing that by taking the J-51 tax abatement the landlord voluntarily subjected itself to a non-discrimination rule not applicable to landlords generally at the time). While the landlord in *Kosoglyadov* agreed to participate in Section 8 by taking the J-51 tax

50

credit, nowhere is it alleged that Trust accepted any government benefit in exchange for agreeing to participate in Section 8.

*Tapia v. Successful Mgmt. Corp.* involved a landlord that voluntarily enrolled in the J51 program but also discussed the application of NYC Admin. Code 8-107. 79 A.D.3d 422, 424-25 (1st Dep't 2010). As such, *Tapia* is the only case in New York, aside from *Mother Zion*, that engaged in any analysis of the question at issue here. *Tapia*, which relied primarily on *Rosario* and *Kosoglyadov*, missed the distinction between voluntarily agreeing not to discriminate by enrolling in the J-51 program and being forced to accept Section 8 tenants through legislation. *Tapia*, 79 A.D.3d at 424. The First Department in *Tapia* misconstrued its prior holding in *Mother Zion*, holding that "this Court recognized that the Section 8 program, while voluntary in nature, did not preempt local antidiscrimination laws." *Id*. There is no support for that contention in *Mother Zion*, and the *Tapia* panel misstated the *Mother Zion* holding. *People v. Ivybrooke Equity Enterprise, LLC* provides no analysis of the issue of preemption aside from a citation to *Kosoglyadov* and *Rosario*. 175 A.D.3d 1000, 1003 (4th Dep't 2019) (citing cases that involved landlords who intentionally agreed to accept Section 8 tenants by participating in incentive-based programs).

Cases from outside of New York rejecting preemption arguments are likewise distinguishable. The Western District of Texas declined to find preemption in *Austin*

*Apt. Ass'n v. City of Austin* because it saw "no reason to swim against the current." 89 F. Supp. 3d 886, 895 (W.D. Tex. 2015) (relying on the analysis of others and adding nothing to the conversation). Each of those cases identified Congress's purpose, but none discussed Congress's intended effect in making participation in Section 8 voluntary.

### C. HUD's Position on Preemption in Inapposite.

HUD's statement regarding preemption applies only to its own regulations, not to the statute from which they are derived. 24 C.F.R. § 982.53(d). Thus, it is possible for HUD to avoid intentionally preempting state law while Congress intentionally did so when enacting Section 8 in 1974. HUD's statement of non-preemption is limited by the phrase "[h]owever, such State and local laws shall not change or affect any requirement of this part, or any other HUD requirements for the administration or operation of the program," which is an expression of clear intent to give rise to conflict preemption where actual conflicts exist. 24 C.F.R. § 982.53(d). The City's law, which forces landlords who cannot participate in Section 8 to participate, and bars them from making statements to the renting public regarding their lack of ability to participate, is in direct conflict with HUD regulations and 42 U.S.C. § 1437f.

## **CONCLUSION**

For the reasons stated herein, the Court should reverse the District Court's order and judgment dismissing the case, grant the Trust summary judgment on its declaratory judgment claims, remand the case for consideration of the Trust's claim for attorneys' fees under 42 U.S.C. § 1988(b) and grant the Trust such other and further relief as the Court deems just and proper.

Dated: May 7, 2025

BOND, SCHOENECK & KING, PLLC

By: _____

Curtis A. Johnson
*Attorneys for Appellant 216 East 29th Street Trust*
350 Linden Oaks, Third Floor
Rochester, New York 14625-2825
Telephone: (585) 362-4700
cjohnson@bsk.com

53